**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **JOSHUA RAY TYNER,** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **Civ. No. DLB-19-2529** |
| **CATELIN DAGILAS,** *et al.*, | * | |
| **Defendants.** | * | |

**MEMORANDUM OPINION**

While Joshua Ray Tyner was in prison, his daughter was born. Within days of her birth, the Circuit Court for Harford County, Maryland found her mother could not take care of her and removed the child to the custody of the Harford County Department of Social Services. Less than two years later, the child's mother died. Then Tyner's parental rights were terminated. Tyner remains incarcerated.

Now, Tyner claims four social workers from the Harford County Department of Social Services deprived him of his right to parent his child, in violation of the U.S. Constitution and the Maryland Declaration of Rights. Whether the defendants violated Tyner's rights or not, they are immune to Tyner's federal claims. So the Court grants the defendants' motion for summary judgment on them. A Maryland court would be better suited to rule on Tyner's Maryland claim, so the Court declines to exercise supplemental jurisdiction over that claim and dismisses it without prejudice.

**I.    Background**

Tyner's daughter was born on February 14, 2017. ECF 88-3, ¶ 13. At the time, Tyner was incarcerated in Lancaster County Prison in Lancaster, Pennsylvania pending trial on several

criminal charges. *Id.* ¶ 19. The child's mother was married to another man. *Id.* ¶ 15. The child's birth certificate—issued March 21, 2017—did not list anyone as her father. *Id.* ¶ 14.

At delivery, the child's mother had a positive screening for marijuana. *Id.* ¶ 17. Two days after the birth, the Harford County Department of Social Services ("the Department") determined the child's mother could not provide proper care for her and petitioned the Circuit Court for Harford County, Maryland to designate her a Child in Need of Assistance ("CINA"). *Id.* ¶ 21. On February 17, 2017, the circuit court ordered Tyner's daughter placed in the temporary care and custody of the Department. *Id.* ¶ 22.

Around this time, the child's mother advised the Department that Tyner was the child's biological father. *Id.* ¶ 23. On March 8, 2017, the Department's Child Protective Services Unit wrote a letter to Tyner advising him that they were attempting to contact him about a very important matter. *Id.* ¶ 24. On March 15, 2017, the circuit court held a hearing without Tyner present, determined that Tyner's daughter was a CINA, and committed her to the custody of the Department for eventual placement in foster care. *Id.* ¶ 25. On March 27, 2017, the Department received a letter from Tyner "advising that he might be [the child's] biological father and requesting that a paternity test be conducted." *Id.* ¶ 27. On March 30, 2017, the circuit court ordered that Tyner submit to a paternity test. *Id.* ¶ 28. On April 18, 2017, Catelin Dagilas—a licensed social worker who served as a Department caseworker—initiated the process of scheduling Tyner's paternity test with LabCorp. *Id.* ¶ 29. On April 28, 2017, LabCorp informed Dagilas that Tyner's paternity test would be collected and returned by May 18, 2017. *Id.* ¶ 30. However, on July 13, 2017, LabCorp emailed Dagilas "that there had been a miscommunication concerning Mr. Tyner's collection" and that LabCorp was in the process of dispatching another collector to the prison. *Id.* ¶ 31. On July 28, 2017, LabCorp informed Dagilas that Tyner's sample would be returned by

August 18, 2017. *Id.* ¶ 32. LabCorp collected a sample from Tyner on August 15, 2017. *Id.* ¶ 33. On August 28, 2017, the Department received the results from LabCorp: Tyner was the child's biological father. *Id.* ¶ 34.

Meanwhile, on August 16, 2017, before Tyner was determined to be the child's biological father, the circuit court held an initial hearing to plan for a permanent placement for the child, determined that the Department had made reasonable efforts to reunify the child with a parent, and declared that the primary plan for the child's future would be to reunite the child with a parent. *Id.* ¶ 26. On October 30, 2017, Dagilas sent Tyner a letter informing him of that ruling, of the date and time of the next hearing, and of the fact that Tyner was entitled to counsel in the CINA proceedings, and advising him to reach out to the office of the state public defender to obtain representation. *Id.* ¶ 35. On November 30, 2017, Dagilas emailed the Maryland Office of the Public Defender to advise it that Tyner requested legal representation. *Id.* ¶ 36. Ultimately, from January 3, 2018 through April 23, 2019, Tyner was represented by state public defender Kim Wagner. *Id.* ¶ 49.

On November 30, 2017, the Department held a Family Involvement Meeting to discuss whether the Department should recommend that the court move Tyner's daughter out of general foster care and into a foster placement with her maternal cousins. ECF 88-7, at 6; ECF 92-1, ¶ 5. Before the meeting, Tyner gave Dagilas his phone number so that he could be dialed into the meeting. ECF 88-7, at 7; ECF 92-1, ¶ 5. As the meeting began, someone tried to call him—Dagilas says the facilitator called Tyner and he did not pick up, but Tyner says Dagilas dialed the wrong number. ECF 88-7, at 6; ECF 92-1, ¶ 6. Either way, no call reached Tyner. ECF 88-7, at 6; ECF 92-1, ¶ 5. All participants in the meeting, including Tyner's parents, agreed to recommend the proposed change in placement to the court. ECF 88-7, at 5; ECF 92-1, ¶ 5. Accordingly, at a

December 6, 2017 hearing, a magistrate judge recommended that Tyner's daughter be placed with her maternal cousins for foster care. ECF 88-8. According to Tyner, the Department did not inform him of this hearing. ECF 92-1, ¶ 8.

Tyner also claims that sometime after his paternity was established, he requested information about his daughter's health and wellbeing from Dagilas and her supervisor, Maureen McKinley. ECF 92-1, ¶ 3. They did not provide him the information he requested. *Id.*

Tyner also sought to have his name added to his daughter's birth certificate. *See* ECF 88-3, ¶ 37. However, the Maryland Division of Vital Records would not enter Tyner's name on the certificate without a court order. *Id.* On December 6, 2017, Dagilas asked the attorneys representing the Department to obtain a court order adding Tyner's name to the child's birth certificate, and the Department moved for that order. *Id.* ¶ 38. In February 2018, a magistrate judge recommended that Tyner be added to the birth certificate. *Id.* ¶ 40. The child's attorney objected to that recommendation. *Id.* On May 9, 2018, the circuit court ordered Tyner's name added to the birth certificate. *Id.* ¶ 41.

The CINA proceedings continued. On January 3, 2018, the circuit court held another hearing on the child's foster placement. *Id.* ¶ 39. Tyner attended the hearing by phone, with his counsel present in court. *Id.* The court ordered the child to remain in the custody of the Department for eventual placement with her maternal cousins. *Id.* The court also directed that "the father shall have visitation with the minor child, supervised as directed by [the Department]." ECF 92-12, at 5. However, at that time the Lancaster County Prison only permitted children to visit if the prisoner was listed on the child's birth certificate as a parent. ECF 88-3, ¶ 9. Tyner had not yet been listed as a parent. *See id.* ¶ 41. In March 2018, Tyner was convicted and sentenced to 12 to 35 years of

incarceration. *Id.* ¶ 12. In the May 9 order directing that Tyner's name be added to the birth certificate, the court revoked its directive that Tyner have visitation with his daughter. *Id.* ¶ 41.

On May 23, 2018, the circuit court held another hearing, again found the Department had made reasonable efforts to reunite the child with a parent, but changed the plan for the child's permanent placement from reunification with a parent to adoption. *Id.* ¶ 42. The circuit court also ordered the Department to supervise visitation between the child and Tyner. *Id.* At that time, Tyner was incarcerated at Camp Hill Prison in Camp Hill, Pennsylvania. *Id.* ¶ 7. Camp Hill Prison prohibited visitation while a prisoner was in the "classification period." *Id.* ¶ 10. Whether Tyner was in the classification period at that time is unknown. *Id.* Over the next three years, the circuit court held six additional hearings to plan for a permanent placement for Tyner's daughter and issued orders at each hearing. *Id.* ¶ 43. None of those orders provided for visitation with Tyner. *Id.*

On June 13, 2018, the Department petitioned to terminate Tyner's parental rights and obtain guardianship of the child, including the right to consent to her adoption—thereby initiating a Termination of Parental Rights ("TPR") proceeding. *Id.* ¶ 45. The Department transferred responsibility for the child's case from Dagilas to Noel Francis, a Department adoption worker. *Id.* ¶ 47. Tyner objected to the termination of his parental rights, so a TPR trial was set for December 6, 2018. *Id.* ¶ 46.

On September 3, 2018, the child's mother died. *Id.* ¶ 48.

Tyner claims he made numerous attempts to arrange for visitation with his daughter between the establishment of his paternity and the TPR trial. ECF 92-1, ¶¶ 9, 11–13. Nevertheless, in a November 26, 2018 report to the TPR court, Dagilas wrote that Tyner had been offered visitation with his daughter by her foster parents and the Department, but that he had declined.

ECF 92-17, at 3. She also wrote that the Department had not heard from Tyner since February 14 of that year. *Id.*

The TPR trial began on December 6, 2018. ECF 88-3, ¶ 50. At the trial, Dagilas testified that she had offered Tyner visitation, that he had refused visitation, and that he had never requested visitation. ECF 92-20, at 23–25. As Dagilas later admitted in a deposition, Tyner had requested visitation. ECF 92-4, at 21.

The circuit court continued the TPR proceedings to April 23, 2019. ECF 88-3, ¶ 51. After further delays, the court requested that the Office of the Public Defender appoint new counsel to replace Wagner. *Id.* ¶ 52. Beginning on December 6, 2019, Tyner was represented by Deborah Warner-Dennis, panel counsel for the Office of the Public Defender. *Id.* ¶ 53. On January 15, 2021, Tyner terminated her representation and moved to proceed without representation, waiving his right to counsel. *Id.* ¶ 55. The circuit court granted his motion. *Id.*

On September 15, 2021, the circuit court granted the Department's petition for guardianship and terminated Tyner's parental rights. *Id.* ¶ 56. The court found by clear and convincing evidence that exceptional circumstances made the continuation of Tyner's parental rights detrimental to his daughter's best interests. *Id.*

Tyner appealed the termination of his parental rights, contending that the circuit court violated his federal constitutional right to procedural due process by preventing him from meaningfully participating in the proceedings, by finding that the Department had made reasonable efforts to reunite him with his child, and by making erroneous factual findings. *Id.* ¶ 57. The Maryland Appellate Court affirmed. *Id.*; *see also In re W.K.*, No. 1252, Sept. Term, 2021, 2022 WL 2135029 (Md. App. Ct. June 14, 2022). Tyner petitioned the Maryland Supreme Court for a

writ of certiorari, but the court denied his petition. ECF 88-3, ¶ 58. Then Tyner petitioned the United States Supreme Court for a writ of certiorari, but that court denied his petition as well. *Id.*

On August 29, 2019—while the CINA proceedings and the TPR proceedings were ongoing—Tyner filed this case under 42 U.S.C. § 1983. ECF 1. In the operative complaint, Tyner claims Dagilas, Francis, McKinley, and Jerome Reyerson (the Director of the Department) violated his First and Fourteenth Amendment right to familial association, his Fourteenth Amendment right to procedural due process, and Article 24 of the Maryland Declaration of Rights. ECF 67.

On September 22, 2023, the defendants moved for summary judgment. ECF 88. Tyner opposed the motion. ECF 92. The defendants replied. ECF 94. The defendants also moved to strike portions of Tyner's opposition for relying on inadmissible evidence. ECF 96.[1] Tyner opposed that motion as well. ECF 99. The defendants replied. ECF 100. Also pending are several consent motions to seal these filings. ECF 89, 93, 95, 97, 98.[2]

As of October 2023, Tyner has never met his daughter. ECF 92-1, ¶ 15.

## II.    Standard of Review

Summary judgment is appropriate when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). The Court must "view the evidence in the light most favorable to the nonmoving party" and avoid "weigh[ing] the evidence or mak[ing] credibility determinations." *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017)

---

[1] The defendants' motion to strike, ECF 96, is denied as moot because the Court does not rely on the disputed materials.

[2] The consent motions to seal, ECF 89, 93, 95, 97, 98, are granted.

(quoting *Jacobs v. N.C. Admin. Off. of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015)) (internal quotation marks omitted). However, the Court also must abide by its "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993) (quoting *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987)) (internal quotation marks omitted).

If the moving party demonstrates "an absence of evidence to support the nonmoving party's case," the burden shifts to the nonmoving party to "present specific facts showing that there is a genuine issue for trial." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015). A factual dispute is genuine only where there is sufficient evidence to permit a reasonable jury to find in the nonmoving party's favor. *Id.*; *see also Perkins v. Int'l Paper Co.*, 936 F.3d 196, 205 (4th Cir. 2019). "To create a genuine issue for trial, 'the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence.'" *Humphreys & Partners Architects*, 790 F.3d at 540 (quoting *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013)). "Instead, the nonmoving party must establish that a material fact is genuinely disputed by, *inter alia*, 'citing to particular parts of the materials of record.'" *United States v. 8.929 Acres of Land in Arlington Cnty.*, 36 F.4th 240, 252 (4th Cir. 2022) (quoting Fed. R. Civ. P. 56(c)(1)(A)).

## III.   Discussion

Tyner's two § 1983 claims are barred by qualified immunity or absolute immunity. The Court declines to exercise supplemental jurisdiction over his claim under the Maryland Declaration of Rights.

Under § 1983,

[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United

States or any person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. To succeed on a § 1983 claim, the plaintiff "must prove two elements": that the defendants deprived the plaintiff of a right secured by the Constitution and laws of the United States and that the defendants acted under color of state law. *Mentavlos v. Anderson*, 249 F.3d 301, 310 (4th Cir. 2001).

Under the doctrine of qualified immunity, a government official is immune to liability for civil damages unless they "violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Atkinson v. Godfrey*, 100 F.4th 498, 504 (4th Cir. 2024). Public social services workers may invoke qualified immunity for their conduct in child custody and parental rights cases. *Renn ex rel. Renn v. Garrison*, 100 F.3d 344, 349 (4th Cir. 1996) (quoting *Hodge v. Jones*, 31 F.3d 157, 162 (4th Cir. 1994)).

As the definition suggests, the qualified immunity inquiry concerns two questions: "whether a constitutional violation occurred" and "whether the right at issue was 'clearly established' at the time of the events in question." *Atkinson*, 100 F.4th at 498 (quoting *Melgar ex rel. Melgar v. Greene*, 593 F.3d 348, 353 (4th Cir. 2010), and *Stanton v. Elliott*, 25 F.4th 227, 233 (4th Cir. 2022)). A court may answer these questions "in the order that would best facilitate the fair and efficient disposition of the case." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). For that reason, a court "may grant qualified immunity on the ground that the purported right was not clearly established without resolving" whether the right "exists at all." *Id.* (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).

A right is clearly established if but only if "[t]he contours of the . . . right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Renn*,

100 F.3d at 349 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "Clearly established rights include specifically adjudicated rights as well as those manifestly included within more general applications of the core constitutional principles involved." *Ross v. Cecil Cnty. Dep't of Soc. Servs.*, 878 F. Supp. 2d 606, 616 (D. Md. 2012) (citing *Wilson v. Layne,* 141 F.3d 111, 114 (4th Cir. 1998)). In Maryland, a right is clearly established if it has been recognized by "(1) an authoritative decision by the United States Supreme Court; (2) an authoritative decision by the Fourth Circuit Court of Appeals; or (3) an authoritative decision by the Court of Appeals of Maryland," or a consensus of other federal circuit courts. *Id.*; *see also Atkinson*, 100 F.4th at 501 (holding that a right was not clearly established because "[n]either the Supreme Court, our Court, the highest court of the state where the conduct occurred[,] nor a consensus of other circuit courts of appeals have determined that conduct similar to that of the [defendant] is unconstitutional").

Courts "must identify the specific right the plaintiff alleges was infringed at a 'high level of particularity.'" *Atkinson*, 100 F.4th at 505 (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 250–51 (4th Cir. 1999)). In other words, "there must be case law not just about the general principle" the plaintiff invokes, but that "establish[es] that conduct similar to [the defendant's] is unconstitutional." *Id.* "Although a case directly on point is not required, existing precedent 'must have placed the statutory or constitutional question beyond debate.'" *Id.* at 505–06 (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam)).

### A. Familial Association

Tyner contends that the defendants violated his fundamental constitutional right to familial association. "The bonds between parent and child are, in a word, sacrosanct." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 343 (4th Cir. 1994). "[T]he sanctity of the family unit is a fundamental precept firmly ensconced in the Constitution and shielded by the Due Process Clause of the

Fourteenth Amendment," *Hodge*, 31 F.3d at 163, and "also, to some degree . . . by the freedom of association found in the First Amendment," *Desper v. Clarke*, 1 F.4th 236, 243 (4th Cir. 2021). In fact, "the interest of parents in the care, custody, and control of their children" is "perhaps the oldest of the fundamental liberty interests" our law recognizes. *D.B. v. Cardall*, 826 F.3d 721, 740 (4th Cir. 2016) (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)).

"The fundamental right of a parent to control the upbringing of her child, however, is 'neither absolute nor unqualified.' Rather, that right is 'subject to the child's interest in his personal health and safety and the state's interest as *parens patriae* in protecting that interest.'" *Id.* (quoting *Martin v. Saint Mary's Dep't of Soc. Servs.*, 346 F.3d 502, 506 (4th Cir. 2003), and then *White ex rel. White v. Chambliss*, 112 F.3d 731, 735 (4th Cir. 1997)). For that reason, the right may be outweighed by the legitimate governmental interest in preventing the abuse and neglect of minors. *Hodge*, 31 F.3d at 164.

As the Fourth Circuit long has recognized, "[t]he contours of the right to family integrity may not be 'sufficiently clear' in certain situations, to be deemed 'clearly established' as required." *Martin*, 346 F.3d at 506 (quoting *Renn*, 100 F.3d at 349); *see also Hodge*, 31 F.3d at 164 ("The dimensions of the right to familial privacy have yet to be clearly established.") (quoting *Frazier v. Bailey*, 957 F.2d 920, 931 (1st Cir. 1992)).

### 1. Paternity Test and Birth Certificate

Tyner claims that the defendants violated his right to associate with his daughter by delaying the arrangement of a paternity test and the entry of his name on his daughter's birth certificate. But Tyner had no clearly established right to their swift support with either process.

A few undisputed facts bear repeating to identify the contours of the rights Tyner asserts. Start with the paternity test. At the time Tyner's daughter was born, her mother was married to a

different man. As a result, that man—not Tyner—was the legally presumptive father of the child. *See Sieglein v. Schmidt*, 136 A.3d 751, 759 (Md. 2016) ("A child born or conceived during a marriage is presumed to be the legitimate child of both spouses.") (quoting Md. Code Ann., Est. & Tr. § 1-206(a)). Sometime shortly after the child was born, her mother informed the Department that Tyner was the child's father. In response, the Department attempted to reach him. When Tyner first communicated with the Department to request paternity testing on or around March 27, 2017, he "advis[ed] that he might be [the child's] biological father." ECF 88-3, ¶ 27. Three days later, the circuit court ordered a paternity test. On April 18, Dagilas opened a case with LabCorp to schedule the test. On April 28, LabCorp scheduled the test for May 12. On July 13, LabCorp informed Dagilas "that there had been a miscommunication concerning Mr. Tyner's collection but that they were in the process of finding another collector to go to the prison." On July 28, Labcorp informed Dagilas that it had rescheduled Tyner's test. The Department received Tyner's test results on August 28. As to the paternity test, then, Tyner's claim rests on whether an incarcerated man who claims to be the biological father of a child presumptively born to a different father has a right to a paternity test from his child's custodians within five months of his request for a paternity test.

Turn to the birth certificate. Even after the paternity test verified Tyner's status, the Maryland Division of Vital Records would not add Tyner to the birth certificate without a court order. On December 6, 2017, Dagilas asked the Department's attorneys to secure a court order, and the Department moved for one. In February 2018, a juvenile court magistrate judge recommended that the juvenile court enter that order. However, the child's attorney objected to that recommendation. On May 9, the circuit court ordered Tyner's name added to the birth certificate. As to the birth certificate, then, Tyner's claim rests on whether the biological father of

a child has the right to be recognized as the child's father on the birth certificate within nine months after the establishment of his paternity.

Neither of those ostensible rights was clearly established at the time of these events, and no similar rights have been established since. Tyner cites no case from any jurisdiction at any time holding that the "contours of the right to family integrity," *Martin*, 346 F.3d at 506, encompass the right of a putative biological parent to paternity testing at all, much less the right of an incarcerated claimant to the paternity of a child with a presumptively different father to have such testing facilitated by social services officials and completed within five months of his request. Nor does Tyner cite any case addressing the right of a biological father to the timely entry of his name on the child's birth certificate. All Tyner cites are cases establishing the right to family integrity and association at the highest level of generality. *See, e.g.*, *Moore v. City of East Cleveland*, 431 U.S. 494, 503–04 (1977) ("[O]ur decisions establish that the Constitution protects the sanctity of the family[.]"); *Smith v. Org. of Foster Families for Equality & Reform*, 321 U.S. 158, 166 (1977) (recognizing the "private realm of family life which the state cannot enter"); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 619–20 (1984) (recognizing the freedom of association protects the freedom to maintain familial relationships); *Hodge*, 31 F.3d 157 ("the sanctity of the family unit is a fundamental precept firmly ensconced in the Constitution and shielded by the Due Process Clause of the Fourteenth Amendment"). However, this Court must identify the right at issue "at a 'high level of particularity,'" *Atkinson*, 100 F.4th at 505 (quoting *Edwards*, 178 F.3d at 250–51), by way of "case law not just about the general principle" Tyner invokes, but case law "establish[ing] that conduct similar to [the defendants'] is unconstitutional." *Id.*

This is a circumstance where "[t]he contours of the right to family integrity" are not "'sufficiently clear' . . . to be deemed 'clearly established' as required." *See Martin*, 346 F.3d at

506 (quoting *Renn*, 100 F.3d at 349). As the Fourth Circuit has said in similar situations, "[t]o expect [defendant social workers] to resolve what reasonable jurists have long debated—namely the precise strictures of the penumbral right of familial privacy, cast in the sweeping language of the Supreme Court cases cited by [Tyner] . . .—is to impose burdens and expectations well beyond their reasonable capacities." *See Hodge*, 31 F.3d at 167 (citing *Swanson v. Powers*, 937 F.2d 965, 968 (4th Cir. 1991)). The rights Tyner claims the defendants violated were not clearly established.

The defendants enjoy qualified immunity to Tyner's claims that they should have facilitated paternity testing and the entry of his name on his daughter's birth certificate faster than they did.

## 2. Information

Next, Tyner claims the defendants violated his right to familial association by refusing to share information about his daughter's development with him after his paternity was established. But Tyner had no clearly established right to that information from the defendants. As a result, they have qualified immunity to this claim.

*Booker v. South Carolina Department of Social Services*, No. 12-985-TMC, 2013 WL 4500045 (D.S.C. Aug. 20, 2013), illustrates the problem that sinks Tyner's claim. While Patrick Booker was incarcerated, his minor daughter was in the custody of her mother but lived with her grandparents pursuant to an agreement with the South Carolina Department of Social Services ("SCDSS"). *Id.* at *1. One day, a sheriff's office investigator found the mother's other two children in the mother's home in violation of that agreement. *Id.* In response, the investigator took those two children into emergency protective custody, then picked up Booker's child from school and took her into emergency protective custody as well. *Id.* Ultimately, Booker's child ended up in SCDSS custody for months. *Id.* at *2. While the child was in SCDSS custody, Booker wrote to an

SCDSS employee to request "copies of his daughter's medical and dental records and her contact information," as well to arrange for a visit or call while he was in prison. *Id.* The SCDSS employee refused his requests, "effectively denying him access to his daughter for the time she was in SCDSS custody." *Id.* Booker sued this SCDSS employee, SCDSS, and others under § 1983 for violating his Fourteenth Amendment rights. *Id.* at *1. In relevant part, he argued that the employee's refusal to give him access to the information about his child's health and wellbeing "constitute[d] an interference with his parental rights." *Id.* at *5. The district court held that the SCDSS employee had qualified immunity to Booker's claim because Booker had no clearly established right to that information about his daughter. *Id.* "The rights of a natural, noncustodial parent against those of the state as custodial caretaker is an interesting, although, unfortunately for Booker, not entirely settled area of the law," the court observed. *Id.* In the absence of any case on point and in light of "the unique facts presented," the court could not "conclude that [the SCDSS employee] violated a clearly established constitutional right." *Id.* After Booker appealed, the Fourth Circuit affirmed, underscoring that the employee "was rightly granted qualified immunity." *Booker v. S.C. Dep't of Soc. Servs.*, 583 Fed App'x 147, 148 (4th Cir. 2014).

Tyner's claim is barred by qualified immunity for the same reasons Booker's was. Tyner, like Booker, is an incarcerated, non-custodial, biological father of a minor child. Tyner's daughter, like Booker's daughter, was in the custody of public social services during the relevant period of time because she was removed from the custody of her mother for her welfare. Just as Booker sought his daughter's medical and dental records for the time she was in state custody, so Tyner claims to have sought "information concerning [his daughter's] health, cognitive development, emotional development, and social development." ECF 92-1, at 2. Just as an SCDSS social worker denied Booker the information about his child's wellbeing he requested, so Dagilas allegedly

denied Tyner the information about his child's wellbeing he requested. And just as no case established the right of a noncustodial, biological parent to information about their child from the state while the state served as the child's custodial caretaker when Booker brought his claim, no case has established that right in the decade since. Accordingly, Tyner had no clearly established right to the information he claims Dagilas denied him. Dagilas has qualified immunity to his claim.

### 3.  Visitation

Tyner also contends that the defendants violated his right to associate with his daughter by failing to facilitate visitation with her. But the right of an incarcerated biological parent to in-person visitation by their minor child was not clearly established. So the defendants enjoy qualified immunity to Tyner's visitation-based claim.

First, "there is no clearly established constitutional right to visitation in prison." *Desper*, 1 F.4th at 244. As the Fourth Circuit recently explained, "no case from [the Supreme] Court or our court 'clearly establishes a constitutional right to visitation in prison grounded in the First . . . or Fourteenth Amendments.'" *Id.* at 243–44 (quoting *Williams v. Ozmint*, 716 F.3d 801, 806 (4th Cir. 2013)). The chief reason is that "the freedom of association is among the rights least compatible with incarceration . . . [which] itself entails a restriction on the freedom of inmates to associate with those outside of the penal institution." *Id.* at 243 (citations and quotation marks omitted). Tyner cannot predicate his claim on any general right of incarcerated people to visitation.

Second, it is not clearly established that the "contours of the right to family integrity," *Martin*, 346 F.3d at 506, encompass the right of an incarcerated biological parent to in-person visitation by his minor child, either. *See Booker*, 2013 WL 4500045, at *5 (holding social worker did not violate clearly established right of incarcerated biological father because there was no case law "directly addressing visitation rights of a noncustodial, incarcerated parent"). Tyner cites no

case applying that general right to facts like these. And the Fourth Circuit has cautioned courts not to assume that the right to familial association applies to incarcerated parents on the same terms as it applies to parents who are not incarcerated. *See Desper*, 1 F.4th at 243–44, 246. "By its very nature, prison restricts an incarcerated father's interactions with his children." *Id.* at 246.

Tyner cites just one case for his position: *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202 (4th Cir. 2017). But *Heyer* is off point. In *Heyer*, a deaf civil detainee who communicated primarily in American Sign Language and could not communicate well in written English brought a First Amendment challenge to the prison's refusal to provide him with a videophone to communicate with people outside the prison. *Id.* at 205–07, 212–13. The Fourth Circuit opened its analysis with the observation that "[c]ourts have generally concluded that the First Amendment rights retained by convicted prisoners include the right to communicate with others beyond the prison walls." *Id.* at 213. And the Fourth Circuit quoted cases recognizing that "convicted prisoners retain a 'First Amendment right to communicate with family and friends.'" *Id.* (quoting *Pope v. Hightower*, 101 F.3d 1382, 1385 (11th Cir. 1996)). Ultimately, the Fourth Circuit held that the district court had erred in granting summary judgment to the prison on Heyer's First Amendment claim because a jury could have found that the prison unreasonably denied him access to a videophone. *Id.* at 218–19.

*Heyer* indicates that people incarcerated have a First Amendment right to communicate with family and friends outside. However, *Heyer* never says or implies what Tyner suggests: that people incarcerated have a First Amendment right to visitation by family and friends. In the absence of any authoritative case indicating that conduct like the defendants' is unconstitutional, Tyner did not have a clearly establish right to visitation by his daughter. For that reason, the defendants have qualified immunity to his claim.

### 4.   Participation in Proceedings

Next, Tyner claims that the defendants failed to notify him of and include him in one meeting and one hearing concerning his daughter's foster care placement. However, the defendants have qualified immunity to this claim because Tyner had no clearly established right to be notified by the defendants of these proceedings and included in them. In the alternative, the defendants had absolute immunity for these alleged actions because they were taken in a prosecutorial capacity.

Tyner claims that the defendants failed to notify him of, or take steps sufficient to include him in, two proceedings in his daughter's CINA case. He alleges that during the November 30, 2017 Family Involvement Meeting addressing whether to place his daughter with her maternal cousins, Dagilas called the wrong number to dial him in, depriving him of the opportunity to participate. He alleges that the defendants failed to inform him of the December 6, 2017 emergency placement hearings. And he alleges that because Dagilas referred him to the Harford County Public Defender's office to secure counsel to represent him in his daughter's CINA case, he was not able to secure counsel in time for that December 6, 2017 hearing either.

The defendants have qualified immunity to this claim because Tyner had no clearly established right to notice from them of the November 30 meeting or the December 6 meeting, nor to a more timely referral to counsel. Tyner cites no cases recognizing the right of a noncustodial biological parent to notice of a meeting or hearing concerning their child's foster placement. Nor is this Court aware of any. In the absence of any authority clearly establishing the right at issue, the defendants have qualified immunity to this claim. *See Hodge*, 31 F.3d at 167; *Atkinson*, 100 F.4th at 501.

In the alternative, the defendants have absolute immunity. Prosecutors "are absolutely immune from § 1983 actions for conduct occurring within the scope of their duties in initiating

and pursuing a criminal prosecution." *Vosburg v. Dep't of Soc. Servs.*, 884 F.2d 133, 135 (4th Cir. 1989). This prosecutorial absolute immunity extends "to those activities of social workers that could be deemed prosecutorial" in "judicial proceedings against the parent or guardian of a minor child." *Id.* at 137–38. That immunity covers "prosecutorial actions" like "preparing and filing a [child] removal petition and prosecuting that action." *Evans v. Perry*, 578 Fed. App'x 229, 232 (4th Cir. 2014). "[P]roviding notice of a custody hearing is the sort of prosecutorial function which would give rise to absolute immunity under *Vosburg*." *Hampton v. Motley*, 911 F.2d 722 (Table), at *2 n.9 (4th Cir. 1990). Accordingly, a social worker is absolutely immune from liability for failing to notify an incarcerated parent of a hearing on the removal of, and emergency custody over, their child. *Booker*, 583 Fed App'x at 148.

*Booker* is illustrative again. As described above, while Booker was incarcerated, his child was removed from the child's mother's custody by the state social services department, SCDSS. *Booker*, 2013 WL 4500045, at *1. The day Booker's child was removed, the investigator and an SCDSS social worker informed the child's mother and grandparents of what happened and notified them of the date, time, and location of a probable cause hearing on the children's removal and future custody. *Id.* Neither the investigator nor the social worker notified Booker of the investigation, removal, or hearing. *Id.* At the probable cause hearing, the mother of Booker's child agreed that probable cause existed for the removal of the children, and after a subsequent merits hearing of which Booker was notified, SCDSS took custody for nearly a year. *Id.* at *2. Booker sued the social worker and others under § 1983 for violating his parental rights. *Id.* at *1. The district court held that the social worker enjoyed qualified immunity from liability for failing to inform Booker of the probable cause hearing. *Id.* at *4. On appeal, the Fourth Circuit specified that

the social worker actually enjoyed absolute immunity for that failure because the social worker was acting in a prosecutorial capacity. *Booker*, 583 Fed. App'x at 148.

The defendant social workers are absolutely immune from liability for the conduct Tyner challenges because it was part of their prosecution of the juvenile court action concerning his daughter's removal. *See Evans*, 578 Fed. App'x at 232 (noting social workers are immune from liability for "preparing and filing a [child] removal petition and prosecuting that action"). The proceedings Tyner alleges the defendants failed to include him in concerned his daughter's foster placement while she was in the custody of the Harford County Department of Social Services as a CINA—that is, they were part of the removal proceedings that began when the Department petitioned to designate Tyner's daughter a CINA two days after her birth. As the Fourth Circuit has observed, "the filing of a removal petition is, in essence, the start of judicial proceedings against the parent or guardian of a minor child, and the duties of the social worker at that point are those of an advocate in the process." *Vosburg*, 884 F.2d at 137. So these social workers are absolutely immune for their conduct of the removal action before the juvenile court, *see id.* at 137–38—including their alleged failure to notify Tyner of these two proceedings, *see Booker*, 583 Fed App'x at 148; *Hampton*, 911 F.2d at *2 n.9.

Because the defendants have qualified or absolute immunity from liability for their alleged failures to notify Tyner of these placement proceedings and include him in them, Tyner's claims fail as a matter of law.

### 5.  Testimony and Submissions

Last, Tyner argues that Dagilas violated his right to familial association by deliberately submitting false information about him to the court in the TPR action and then lying in her

testimony before that court. However, Dagilas enjoys either qualified immunity or absolute immunity for her preparation of the report and her testimony.

First, Dagilas enjoys at least qualified immunity from these claims because Tyner did not have a clearly established right to TPR proceedings free from deliberately fabricated evidence. Only the Ninth Circuit ever has recognized such a right. In *Costanich v. Department of Social and Health Services*, 627 F.3d 1101 (9th Cir. 2010), the Ninth Circuit considered a § 1983 action brought by Kathie Costanich, the foster parent and legal guardian of several children, against the Washington State Department of Social and Health Services ("DSHS"), a DSHS social worker, and other officials. *Id.* at 1103. After a referral from one of the children's therapists, the social worker had opened a child abuse investigation into Costanich. *Id.* at 1104. The social worker found that Costanich was emotionally abusive. *Id.* Before DSHS adopted that finding, at least six adult witnesses who participated in the investigation informed DSHS that the social worker's report falsely attributed material statements to them that they never had made. *Id.* at 1105. Nevertheless, DSHS formally found Costanich had engaged in emotional abuse and petitioned to terminate her guardianship of two of the foster children. *Id.* at 1105–06. In support of the petition to terminate Costanich's guardianship rights, the social worker filed a declaration repeating the claims the adult witnesses had disputed. *Id.* at 1105. Before the state court issued a ruling on the petition, DSHS revoked Costanich's foster care license and removed most of her foster children. *Id.* at 1106. Costanich sued, claiming that the social worker violated her Fourteenth Amendment rights by fabricating evidence in the child abuse report and the declaration in support of DSHS's petition to terminate her guardianship rights. *Id.* at 1107–08. The district court granted summary judgment to the DSHS social worker on qualified immunity grounds. *Id.* at 1103.

The Ninth Circuit affirmed. After finding that there were genuine disputes of material fact as to whether the social worker had deliberately fabricated the statements in the report and the declaration, the Ninth Circuit held that there is a "Fourteenth Amendment due process right to be free from deliberately fabricated evidence in a child abuse proceeding." *Id.* at 1111–14. However, the Ninth Circuit then held that the social worker enjoyed qualified immunity to Costanich's claims because this right was not clearly established at the time of the social worker's actions. *Id.* at 1114. Although "going forward, officials who deliberately fabricate evidence in civil child abuse proceedings which result in the deprivation of a protected liberty or property interest" would not be entitled to qualified immunity in the Ninth Circuit, "this right had not previously been clearly established in the civil context." *Id.*

The right the Ninth Circuit recognized is not clearly established in the Fourth Circuit or the state of Maryland. The only district court within the Fourth Circuit ever to cite *Costanich* observed that "[a]t the time of this opinion *Costanich* had not been cited in the Fourth Circuit, or by any other Court of Appeals outside of the Ninth Circuit" and declined "to establish its constitutional holding here." *Nelson v. Green*, 965 F. Supp. 2d 732, 745 (W.D. Va. 2013). In the decade since then, the Fourth Circuit still has never cited *Costanich*, let alone adopted its holding. No other circuit has either. As a result, the right to be free from deliberately fabricated evidence in proceedings like those at issue here was not clearly established in this jurisdiction at the time of the conduct Tyner challenges. *See Atkinson*, 100 F.4th at 501. Qualified immunity bars Tyner's claims against Dagilas for what she wrote in the report and testified in the TPR proceedings.

Tyner suggests that two other cases clearly establish his right to TPR proceedings free from deliberately fabricated evidence. Neither does. First, Tyner claims that *United States v. Agurs*, 427 U.S. 97 (1976), held "that it is clearly established a defendant's right to due process is violated

when the state's case included perjured testimony and 'the prosecution knew, or should have known, of the perjury.'" ECF 92, at 29 (citing *Agurs*, 427 U.S. at 103). *Agurs* did not so hold. In fact, *Agurs* did not concern qualified immunity at all; it concerned the scope of the Fifth Amendment right recognized in *Brady v. Maryland*, 373 U.S. 83 (1963). *See Agurs*, 427 U.S. at 99. The passage Tyner quotes specifies only that "a conviction obtained by the knowing use of perjured testimony . . . must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.* at 103. Even if *Agurs* recognized a clearly established right to a criminal proceeding free from the deliberate use of perjured testimony, Tyner's position would not follow. The fact that a criminal defendant has a clearly established right to a proceeding free from the deliberate use of perjured testimony does not imply that a parent has a clearly established right to a civil proceeding on the termination of their parental rights free from similar defects. *Agurs* alone would not have placed the constitutionality of Dagilas' conduct "beyond debate." *Atkinson*, 100 F.4th at 505–06.

Second, Tyner claims that *Graves v. Depolo*, No. TSE-10-1129 (E.D. Va. Mar. 9, 2011) (slip op), "conclud[ed] that a social worker is not entitled to qualified immunity 'for knowingly submitting false statements in declarations to the court.'" ECF 92, at 29 (quoting *Graves*, TSE-10-1129, at 14 n.13). But that is not what *Graves* said. *Graves* said that a "social worker is entitled to absolute immunity for filing a child removal petition, but there is no such immunity"—that is, no *absolute* immunity—"for knowingly submitting false statements in declarations to the court." *Graves*, TSE-10-1129, at 14 n.13 (citing *Vosburg v. Dep't of Soc. Servs.*, 884 F.2d 133, 138 (4th Cir. 1989)). "Thus, at this stage, it does not appear that [the defendant] is entitled to *absolute* immunity." *Id.* (emphasis added). In fact, *Graves* proceeded to say that the defendant "may be entitled to qualified immunity" because there may not be a clearly established right to a civil child

custody proceeding free from deliberately fabricated evidence. *Id.* In any event, a decision of the Eastern District of Virginia cannot clearly establish law for the District of Maryland. *See Ross*, 878 F. Supp. 2d at 616. There is no clearly established right to a TPR proceeding free from the deliberate falsehoods Tyner alleges Dagilas included in her report and her testimony.

In the alternative, Dagilas is entitled to absolute immunity for these alleged actions. "Our law affords absolute immunity to those persons who aid the truth-seeking mission of the judicial system," including "judges, prosecutors and witnesses." *Day v. Johns Hopkins Health Sys. Corp.*, 907 F.3d 766, 771 (4th Cir. 2018) (citations omitted). The "Witness Litigation Privilege" is "unwavering" and "broad," encompassing even "those who act with malice or ill will." *Id.* at 771–72. When social workers act as witnesses in child custody proceedings—whether by supplying evidence or presenting testimony—they are shielded by the same absolute immunity that shields any other witness. *Watterson v. Page*, 987 F.2d 1, 9 (1st Cir. 1993). Tyner claims that Dagilas "intentionally provided false information to the Harford County Juvenile Court" when she reported that Tyner did not want visitation with his daughter and that the Department had not had contact with Tyner since February 14, 2018, ECF 92, at 19–20, ¶¶ 21–22, and that at the December 6, 2018 TPR hearing, she "intentionally provided false testimony that Mr. Tyner had never requested visitation" with his daughter, *id.* at 20, ¶ 25. Even if Tyner is right about that, her conduct appears to fall within the Witness Litigation Privilege. *Watterson* shows why. There, the mother of two minors brought a § 1983 action against a state social worker and two psychologists for their roles in a child abuse and neglect proceeding against her. *Watterson*, 987 F.2d at 3, 5–6. In relevant part, the mother alleged that one of the psychologists had withheld material evidence from, and submitted false testimony to, the state court. *Id.* at 7, 9. The First Circuit held that this psychologist was absolutely immune from the mother's claim because all witnesses in judicial proceedings

"have an absolute immunity from damages liability based on their testimony," even when they knowingly give false or incomplete testimony. *Id.* at 9. (citing *Briscoe v. LaHue*, 460 U.S. 325, 326 (1983)). In submitting an affidavit to the state court and testifying about her abuse findings, the psychologist acted as a witness. *Id.* Accordingly, she enjoyed absolute immunity. By these lights, Dagilas enjoys absolute immunity for the report and testimony she provided the court too.

Even if Tyner could prove that Dagilas deliberately submitted false information and lied to the court in the termination proceedings, qualified immunity or absolute immunity would protect her from liability for that conduct. Tyner's claim fails as a matter of law.

### B. Procedural Due Process

Tyner also claims the defendants violated his right to procedural due process. "The procedural component of due process 'imposes constraints on governmental decisions which deprive individuals of liberty or property interests within the meaning of the Due Process Clause.'" *D.B.*, 826 F.3d at 741 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976)). "[W]hen the government deprives a person of a protected liberty or property interest, it is obliged to provide 'notice and opportunity for hearing appropriate to the nature of the case.'" *Id.* at 741–42 (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950)). A procedural due process claim "is evaluated under the balancing standard that the Supreme Court articulated in 1976 in *Mathews v. Eldridge*." *Id.* at 742. That three-factor standard turns on: "(1) the nature of the private interest that will be affected, (2) the comparative risk of an erroneous deprivation of that interest with and without additional or substitute procedural safeguards, and (3) the nature and magnitude of any countervailing interest in not providing additional or substitute procedures." *Id.* (quoting *Turner v. Rogers*, 564 U.S. 431, 444–45 (2011)).

Tyner claims that the very same actions that ostensibly violated his right to familial association violated his right to procedural due process. Accordingly, Tyner's procedural due process claim is barred by qualified or absolute immunity for the same reasons his fundamental rights claim is barred by qualified or absolute immunity. Qualified immunity applies to procedural due process claims just as it applies to other § 1983 claims. *See, e.g.*, *Halcomb v. Ravanell*, 992 F.3d 316, 319 (4th Cir. 2021); *Williamson v. Stirling*, 912 F.3d 154, 186 (4th Cir. 2018). The same is true of absolute immunity. *See, e.g.*, *Evans*, 578 Fed. App'x at 223 (holding social workers absolutely immune to procedural due process claim). Tyner's procedural due process claim challenges the same actions by the same defendants. *See* ECF 67, ¶¶ 91–103; ECF 92, at 27 (predicating procedural due process claim on the "acts and omissions" "set forth" in his fundamental rights claim). And Tyner cites no additional authorities that would show that it was clearly established that any of the defendants' actions deprived him of a protected liberty interest or that, if they did, he was entitled to additional process. Accordingly, the defendants have qualified or absolute immunity to Tyner's procedural due process claim, on the terms described in the previous part of this opinion. His procedural due process claim fails as a matter of law.

### C.  Maryland Declaration of Rights

That leaves Tyner's claim that the defendants violated Article 24 of the Maryland Declaration of Rights. A federal court may exercise supplemental jurisdiction over a state law claim like this even after the court has "dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). But a court may decline to exercise supplemental jurisdiction instead. Federal law commits the decision to the court's discretion. *See Hinson v. Norwest Fin. S.C., Inc.*, 239 F.3d 611, 617–18 (4th Cir. 2001). In the exercise of this discretion, courts focus on "the values of judicial economy, convenience, fairness, and comity." *See Carnegie-Mellon Univ. v. Cohill*,

484 U.S. 343, 350 (1988); *see also Hinson*, 239 F.3d at 617–18. "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon*, 484 U.S. at 350 n.7.

This is the "usual case." *Id*. Because the remaining claim sounds in state law alone, a state court is better suited to hear it. Exercising supplemental jurisdiction would undermine, rather than promote, judicial economy, comity, and fairness to the parties. *See Meyler v. Mayor & City Council of Ocean City*, --- F. Supp. 3d ----, 2024 WL 2846746, at *16 (D. Md. 2024) (dismissing claim under Article 24 of the Maryland Declaration of Rights after granting defendants summary judgment on § 1983 claims). Having granted summary judgment to the defendants on Tyner's federal claims, the Court declines to exercise supplemental jurisdiction over his Maryland claim. It is dismissed without prejudice.

## IV.   Conclusion

The defendants' motion for summary judgment, ECF 88, is granted as to Counts I and II and denied as to Count III. Count III is dismissed without prejudice. The defendants' motion to strike, ECF 96, is denied as moot. The consent motions to seal, ECF 89, 95, 97, 98 are granted. A separate order follows.

Date: August 21, 2024

Deborah L. Boardman
United States District Judge